**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MFB Fertility Inc., a Colorado Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-07833 |
| | ) | |
| v. | ) | |
| | ) | |
| Easy Healthcare Corporation, an Illinois corporation, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR INJUNCTION AND FOR RELIEF FOR MISAPPROPRIATION OF
CONFIDENTIAL, PROPRIETARY AND TRADE SECRET INFORMATION**

Plaintiff, MFB Fertility Inc., by and through its counsel, Gary I. Blackman, Christina E. Carrière Lutz and Erin M. Mayer with Levenfeld Pearlstein, LLC, brings this Complaint for Injunction and Other Relief against Defendant, Easy Healthcare Corporation.

## I.  NATURE OF THE ACTION

This is an action to enjoin Defendant, Easy Home Healthcare, a company with whom Plaintiff, MFB Fertility, Inc., had entered into a now terminated distribution agreement, from continuing to utilize misappropriated confidential, proprietary and trade secret information in violation of written confidentiality agreements and from continuing to violate a non-competition agreement.[1]

MFB Fertility, Inc. ("MFB") researches, develops and sells in-home tests for fertility tracking purposes. Plaintiff's founder and CEO, Dr. Amy Beckley, is a scientist with a PhD in Pharmacology and is a nationally recognized fertility expert. After experiencing her own fertility

---

[1] There does exist an arbitration provision in one of the two agreements being sued upon, however, it is not clear (and there may be a dispute) as to whether all the damage claims filed in this action are subject to arbitration. As to Plaintiff's claim for equitable provisional relief, however, such relief can be requested in aid of any required arbitration.

challenges Dr. Beckley, in 2016, literally invented in her basement a test (called Proov) that allows women to confirm successful ovulation by tracking progesterone (PdG) levels at home. (The company's initials stand for **M**y **F**abulous **B**asement).  In the beginning, MFB consisted of two women scientists (one being Dr. Beckley), both of whose battles with infertility led them to want to develop better products for struggling couples.  Proov is now the first, and only, FDA cleared at-home ovulation confirmation test and has been utilized by tens of thousands of women across the United States to assist with ovulation confirmation.

At the outset, and being a new company, MFB needed an experienced distributer to help get its new product to market.  MFB turned to Defendant, Easy Healthcare, who had its own line of fertility test products (though none were progesterone based) and was one of the leading companies in the fertility testing space. Defendant agreed to distribute MFB's proprietary PdG test product. MFB tested and manufactured and supplied its PdG product to Defendant who would then sell the product under its Easy Healthcare private label. Even before the parties signed a distribution agreement, MFB required that Defendant execute confidentiality and non-competition agreements so as to safeguard MFB's confidential, proprietary and trade secret information.

The distributorship relationship lasted ten (10) months and ended on January 15, 2018. After selling off any remaining inventory, Defendant was prohibited, *inter alia*, from directly or indirectly marketing, promoting, manufacturing or selling a competing product for a three (3) year period (until January 15, 2021), and was prohibited for using or disseminating MFB's confidential, proprietary and trade secret information. After their agreement had terminated, the parties did engage in discussions related to the possibility of MFB continuing to supply Defendant with PdG tests for sale. Defendant continued to represent that it could assist MFB with lower cost manufacturing resources and repeatedly expressed the desire to manufacture and distribute the PdG tests. By the Fall of 2019, however, Dr. Beckley had become increasingly uncomfortable with

2

the risk of the loss of confidential information (a valid concern in retrospect), the availability of quality control, and the logistical challenges associated with manufacturing PdG tests at the Chinese facility suggested by Defendant. By mid-November 2019, discussions about the possibility of continuing to work together ended.

Defendant apparently saw in Dr. Beckley and MFB a small, less powerful company that had managed to invent a revolutionary product that they too wanted to manufacture and sell. Defendant decided to manufacture and market its "own" PdG test, utilizing the confidential and trade secret information MFB had confidentially shared with it. Defendant has violated and continues to violate the non-compete by, among other things, maintaining Amazon listings that misrepresent that it still has PdG products to sell when, in fact, it does not because the parties are no longer in contract; is misrepresenting to potential customers that it is still manufacturing a competing PdG product; is directly communicating with potential customers during the non-compete period regarding a PdG test it has manufactured (with MFB's confidential research); is sending out to potential customers (unsolicited) its own PdG tests for those customers "to sample" during the non-compete period; and is currently violating MFB's registered copyright by copying MFB's product instructions and including those as its own.

One example of the lengths Defendant has gone to mislead the public into believing that it is still a legal manufacturer/seller of PdG tests (presumably until the non-compete ends), is that following MFB having been awarded (in March 2020) the only FDA clearance for an at-home PdG test, Defendant revised its phony Amazon listing to say that its PdG test was "FDA Cleared" - an obviously false statement given that not only had Defendant not obtained such clearance but had no PdG products to sell as its agreement with MFB had ended.

Defendant's actions reveal its strategy. After signing the confidentiality agreements, Defendant took confidential and proprietary information Plaintiff had shared and manufactured its

own competing PdG test. Then, knowing it had signed a non-compete, it did everything it could (short of actually selling) to wrongfully compete. Defendant engaged in this bad-faith conduct to limit the intended intent and purpose of the negotiated non-compete; to drive interest and future sales in PdG test strips to its company and away from MFB; and to undercut MFB's efforts to achieve search engine optimization, a favorable Amazon ranking and maintain its distinctiveness and market share.

In other words, Defendant set out to deprive MFB of all the benefits of its bargain when Defendant signed the confidentiality and noncompetition agreements.

## II.    PARTIES

1.      MFB Fertility Inc. is a Colorado corporation with a principal place of business in Builder, Colorado.

2.      Easy Healthcare Corporation is an Illinois corporation with a principal place of business in Burr Ridge, Illinois.

## III.    JURISDICTION AND VENUE

3.      The Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331, as this case involves, among other things, the application of the Defend Trade Secrets Act, 18 U.S.C. § 1836 and claims for Copyright Infringement under 17 U.S.C. § 101 et seq. The Court has supplemental jurisdiction over claims arising under the laws of Illinois pursuant to 28 U.S.C. § 1367 because Plaintiff's claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.  This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and Plaintiff is a citizen of a different state than Defendant.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in the Northern District of Illinois and the Defendant resides in this District.

## IV.     FACTUAL BACKGROUND

### A.  The Business of MFB Fertility and the Development of Its Proov Technology

5.      MFB researches, develops and sells in-home tests for fertility tracking purposes. Its founder, Dr. Amy Beckley, Ph.D. (Pharmacology), is a nationally recognized fertility expert.

6.      The first product MFB developed was the Proov® test, which measures the presence of progesterone metabolites in urine. Progesterone is a hormone produced in the ovaries after ovulation has occurred. These tests allow couples to better monitor their fertility at home.

7.      Proov, which MFB invented and continues to offer for sale, was the first and is the only FDA cleared at-home Ovulation Confirmation Test. Proov has been utilized by tens of thousands of women across the United States to assist with ovulation confirmation.

8.      Unlike previously known ovulation prediction kits ("OPKs"), including OPKs offered by Defendant, which are configured to detect for the presence of Luteinizing Hormone ("LH") in urine, or pregnancy tests configured to detect human chorionic gonadotropin (hCG) and estrogen (or estrogen analytes) in urine, MFB's Proov test detects for the presence of pregnanediol glucuronide (PdG) in urine, which is the major urine metabolite of progesterone. Proov's tests, therefore, provide an indication that ovulation has successfully occurred and is useful to women for a variety of reasons.

9.      Proov is particularly concerned with simple practical procedures that can readily be applied by unskilled persons, e.g. in the home, to provide reliable information concerning confirmation of whether or not ovulation has occurred, whether progesterone levels are sufficient to support a pregnancy, and other information related to or deriving from the presence of

progesterone in the body. Proov may also be used by persons wishing to enhance the likelihood of conception by more clearly identifying the close of the fertility window due to confirmation of ovulation levels.

10. The <u>unique</u> value of MFB's *progesterone-based* pregnancy test is because of the following:

A variety of lateral flow assay-based tests are previously known and available to consumers to help track some of the hormones involved in the female menstrual cycle. Such strips include lateral flow assay-based tests configured to detect FSH, LH and hCG. Other lateral flow assay-based tests include those configured to detect E3G and LH together and to interpret the results to give a digital reading to indicate low, high or peak fertility. **However, there remains a need for a urine based at-home test strip, optionally as a complement or improvement to the other at home urine based lateral flow assay-based tests associated with the female menstrual cycle, that can provide the consumer information regarding their progesterone levels by detecting and even quantitating PdG.**

**A major reason for the present lack of a progesterone test is the peculiar difficulty in detecting the presence of PdG in urine at threshold levels, in stark contrast to the relative general ease in detecting the presence of FSH, LH and hCG in urine**. The difficulty in detecting the presence of PdG in urine derives from the unique chemical structure of PdG. Thus, lateral flow assay-based tests configured to evaluate for the presence of other hormones cannot be easily re-configured to evaluate for the presence of progesterone or its analytes.

**B. MFB's Need for Product Distribution**

11. Soon after successfully completing her research on the effectiveness of a Pdg based test (Proov), Dr. Beckley recognized the need for a new company like hers to establish manufacturing and distribution relationships to enable Proov to benefit the greatest number of women. As such, Dr. Beckley began exploring potential partnerships with distributors and manufacturers with whom she had familiarity due to her own experiences, including Defendant, Easy Healthcare Corporation ("Easy Healthcare"). Dr. Beckley had become acquainted with Easy Healthcare at a trade show in early 2017, after which discussions commenced between her and Sherry Liu, Easy Healthcare's Chief Executive Officer, about the possibility of working together.

12.     Before beginning work with Ms. Liu, however, MFB required that Easy Healthcare (and its Chinese manufacturer, Wondfo Biotech Co., Ltd.) execute confidentiality and/or non-competition agreements so as to safeguard MFB's confidential, proprietary and trade secret information.

**C. Sherry Liu's Relationship with Easy Healthcare and Wondfo USA and Wondfo Biotech Co., Ltd.**

13.     Easy Healthcare was incorporated in Illinois on April 29, 2016, less than a year before the parties entered into their first agreement in February 2017. Sherry Liu has been Easy Healthcare's CEO since its inception.

14.     From October 2010 to September 2015, Ms. Liu was the CEO of Wondfo USA. Wondfo USA is a wholly owned subsidiary of Wondfo Biotech Co., Ltd. ("Wondfo Biotech"), located in Guangzhou, China.

15.     From July 2010 through October 2012, Ms. Liu served as the Vice President, Global Marketing and Sales of Wondfo Biotech. Prior to this, Ms. Liu served as the Director of International Marketing and Sales for Wondfo Biotech from November 2002 through September 2010. (Wondfo USA and Wondfo Biotech are collectively and hereinafter referred to as "Wondfo").

16.     In June 2017, Ms Liu advised Dr. Beckley with MFB that: "*I am still one of the shareholder of Wondfo China and (sic) could be beneficial if Wondfo business keep growing*."

17.     On June 21, 2017, Wondfo wrote to MFB authorizing Ms. Liu to act as its legal agent to negotiate the possible acquisition of the "know-how of Progesterone (PDG) Urine Test" stating:

> **Please accept this letter as authorization for Ms. Sherry Liu CEO of Easy Healthcare Corporation to negotiate on our behalf for acquiring your technology and know-how of producing qualified Progesterone (PDG) Urine Test.**

I, as CEO of Guangzhou Wondfo Biotech Co Ltd authorize that (sic) Ms. Sherry Liu to offer (sic) our proposal on our behalf and communicate with you on our behalf and the final Agreement will be signed by our affiliate in USA after we review and accept the proposal.

See, *June 21, 2017 Authorization Letter*, attached as ***Exhibit 1***. (Emphasis added)

18.    At all relevant times, Ms. Liu, in her capacity as CEO of Easy Healthcare, was authorized by Wondfo to act as its agent in her dealings with Plaintiff, MFB.

**D. The February 22, 2017 Product Testing and Evaluation Agreement**

19.    On February 22, 2017, MFB and Easy Healthcare entered into a Product Testing and Evaluation Agreement pursuant to which MFB would send fifty (50) pregnanediol (PdG) urine test strips ("PdG Products") to Easy Healthcare solely for the purpose of internally testing the PdG Products prior to entering into a formal distribution agreement.

20.    The Product Testing and Evaluation Agreement, among other things, restricted Easy Healthcare's use of the PdG Products to the purpose set forth therein and acknowledged that the PdG Products and the testing results constitute confidential and proprietary information belonging to MFB:

**2. Product Use Rights**

Company [Easy Healthcare] may use the Products solely for the purpose of internally testing the Products. The Products may not be resold or provided to any third party. MFB retains ownership of all right, title and interest in all intellectual property, including any trade secrets, relating to the Products.

**3. Restrictions**

**Company shall not (and shall not allow any third party to**): (i) modify or create derivative works of the Products; (ii) **reverse engineer the Products**; and (iii) use the products, or any of MFB's intellectual property rights in the Products, for any purpose other than MFB's evaluation and testing of the Products. (Emphasis added)

**5. Feedback**

Company agrees to provide to MFB reasonable suggestions, comments and feedback regarding the Products based on MFB's evaluation and testing of the Products ("Feedback").

**6. Confidentiality**

**The Products and Feedback constitute confidential and proprietary information belonging to MFB** (collectively, "Proprietary Information"). Except to the extent authorized in this Agreement or by MFB in writing, Company agrees: (a) not to make any other use of the Proprietary Information; (b) not to duplicate the Proprietary Information; (c) not to make the Proprietary Information available to any third party in any form; and (d) to safeguard the Proprietary Information to the same extent that Company protects its own confidential or proprietary information of similar importance. (Emphasis added)

See, *February 22, 2017 Product Testing and Evaluation Agreement*, attached as **_Exhibit 2_**.

21.     As such, and from their very first work together, Easy Healthcare acknowledged that MFB's PdG Products as well as the results of any evaluation and testing of the Products and the Feedback obtained (all information <u>critical</u> to the PdG Products' success and viability), constitute confidential and proprietary information belonging to the Plaintiff, MFB.

**E.  The March 15, 2017 Distribution Agreement Between MFB and Easy Healthcare**

22.     On March 15, 2017, entered into a Distribution Agreement (the "Distribution Agreement") which provided, among other things, for the purchase, sale and distribution of MFB's PdG Products under the Easy Healthcare private label.  MFB manufactured and provided PdG strips to Easy Healthcare for them to distribute and sell under their branding and name. See, *March 15, 2017 Distribution Agreement*, attached as **_Exhibit 3_**.

23.     The initial term of the Distribution Agreement was ten (10) months and began on March 15, 2017. The initial term was not renewed and, therefore, the Distribution Agreement terminated on January 15, 2018.

24.     Pursuant to the Distribution Agreement, MFB retained full and complete ownership of all its technology and did not grant, license or otherwise transfer to the distributor (Defendant, Easy Healthcare) any right, title or interest in or to any product-related intellectual property:

**Section 2.4 (Ownership of Product Related Intellectual Property Rights)**

Distributor [Easy Healthcare] acknowledges that **this Agreement does not grant, license or otherwise transfer to Distributor any rights, title or interest in rights, title and interest in or to any Product-related intellectual property** (including but not limited to patent rights, know-how and Supplier's [MFB] trademarks and/or copyrights) any such property to Distributor except to the extent of Supplier's limited license to Distributor to use Supplier's Trademarks and Supplier's Materials as set forth in Section 2.3. (Emphasis added)

**Section 2.6. (Trademarks and Copyrights)**

Supplier agrees to use Distributor's trademarks and copyrights only in connection with this Agreement and for the sole purpose of packaging the Products according to the private label specifications for supply to Distributor…

Ex. 3.

25.     Pursuant to the Distribution Agreement, Easy Healthcare acknowledged, <u>again</u>, that all data, samples, reports, and technical or commercial information disclosed to Easy Healthcare by MFB constituted confidential and proprietary information belonged to MFB:

**Section 7.0 (Confidential Information)**

**7.1 Confidential Information** means any proprietary, confidential, non-public information (including Individually Identifiable Information), data, samples, plans, marketing plans, reports, forecasts, technical or commercial information disclosed in writing by one Party to the other Party under this Agreement, as well as information disclosed orally and disclosed to be "Confidential Information" at the time of disclosure".

Ex. 3.

26.     Pursuant to the Distribution Agreement, Easy Healthcare also agreed to a non-compete covenant ("Non-Compete") wherein it agreed, *inter alia*, to not directly or indirectly

manufacture and/or sell Competing Products (as that term is defined) for a period of three (3) years from the date of the Agreement's termination:

> **Section 8 (Non-Compete)**
>
> In order to reduce the Products' cost, the Distributor will approach potential manufacturers to pursue the possible partnership among Supplier, Distributor and potential manufacturer to develop and manufacture Products. Other than this purpose, **the Distributor shall not**, nor shall it permit or cause any of its Affiliates, directors, officers or shareholders to, at any time during the Term and **for a period ending on the third anniversary of the date of termination hereof** ["Non-Compete Period"], either individually or in partnership or in conjunction with any person or persons, firm, association, corporation or other juridical entity, as principal, agent, shareholder or in any other capacity whatsoever, **directly or indirectly manufacture and/or sell Competing Products.**

Ex. 3. (Emphasis added)

27.     "Competing Products" are defined in the Distribution Agreement as: "*any other type of progesterone or pregnanediol home test kits and its semi-finished products such as uncut sheet or other components*." Ex. 3.

**F.  Wondfo Signs a Non-Disclosure Agreement with MFB Fertility**

28.     On June 21, 2017, Wondfo Biotech, entered into a Non-Disclosure Agreement with MFB ("Wondfo NDA") for the purpose of: "*receiving from Corporation information of a non-public nature for use by Receiving Party to determine the feasibility of a business relationship for Receiving Party to license and/or purchase certain intellectual property from Corporation*."

29.     As more fully set forth in the Wondfo NDA, Wondfo (and Sherry Liu and Easy Healthcare as its representatives), acknowledged that the information provided by MFB was confidential and proprietary and that "Receiving Party" shall keep such information confidential and shall not disclose such information, in whole or in part, to any person other than its Representatives.

11

30.     The Wondfo NDA, provides, in relevant part, as follows:

2.     **Confidential Information Defined**. The parties acknowledge that the Receiving Party may receive certain confidential information from or about Corporation or its affiliates information in oral, written, graphic, electromagnetic or other form, including but not limited to past, present and future business, financial and commercial information, business concepts, prices and pricing methods, marketing and customer information financial forecasts and projections, technical data and information, formulae, analyses, trade secrets, patent applications, ideas, methods, processes, know-how, computer programs, products, equipment, product road maps, prototypes, samples, designs, data sheets, schematics, configurations, specifications, techniques, drawings and any other data or information delivered by either of the parties to the other or to which the other party has acquired by way of inspection or observation. All such financial or other business information thus supplied by Corporation to the Receiving Party is hereinafter called the "Information". The term "Information" as used herein also includes the fact that the Information has been made available to or is being inspected or evaluated by the Receiving Party.

4.     **Nondisclosure Obligation**. Receiving Party shall keep such Information confidential and shall not disclose such Information, in whole or in part, to any person other than its Representatives, as defined below, who need to know (it being agreed and understood that such Representatives shall be informed by Receiving Party of the confidential nature of the Information and shall be required by Receiving Party to agree to treat the Information confidentially).

5.     **Obligation of Non-Competition**. The non-competition provisions of this Agreement are an essential and material part of the total agreement, by which the Receiving Party agrees it shall not use any advantages derivable from such Information in its own business or affairs, unless the same is done pursuant to a new agreement executed by all signatories to this document.

6.     **Non-Circumvention**. Receiving Party hereby agrees itself, their officers, directors, agents, associates and any related parties, that they will not, directly or indirectly, contact, deal with or otherwise become involved with any entity or any other entities or parties introduced, directly or indirectly, by or through the other party, its officers directors, agents or associates, for the purpose of avoiding the payment to the Corporation of profits, or otherwise, without the specific written approval of the Corporation.

7.     **Nonuse Obligation**. In addition to its obligation of nondisclosure hereunder, Receiving Party agrees that it will not, directly or indirectly, attempt to appropriate or otherwise exploit Information in any way. It is understood that nothing herein shall be deemed to constitute, by implication or otherwise, the grant of any license or other rights under any patent, patent application, or other intellectual property right or interest belonging to or controlled by the Corporation.

9.      **Ownership and Return of Information**. All Information (including tangible copies and computerized or electronic versions thereof) shall remain the property of Corporation. Within ten (10) days following the receipt of a written request from Corporation, the Receiving Party will either deliver to Corporation or destroy all tangible materials containing or embodying the Information received from Corporation, and Receiving Party shall deliver to Corporation a certificate certifying that all such materials in Receiving Party's possession have been delivered to Corporation or destroyed.

10.      **Inadequacy of Damages**. The Receiving Party acknowledges that damages alone would not be an adequate remedy for the breach of any of the provisions of this agreement. Accordingly, without prejudice to any other rights and remedies it may have, Corporation shall be entitled to the granting of equitable relief (including without limitation injunctive relief) concerning any threatened or actual breach of any of the provisions of this agreement.

11.      **Term**. This Agreement shall, by mutual consent of the parties, remain in force and affect for a period of five years from the date signed and executed by all parties, with the effective date being the date on which the formal signature is affixed hereto.

12.      **Jurisdiction**. The jurisdiction for this Agreement is global and worldwide. Should Corporation assert that a violation has occurred, the parties agree that Corporation shall be entitled to take action to remedy the violation in the locale and/or legal jurisdiction in which the violation occurred and/or in any other locale or jurisdiction(s) which is appropriate, in the opinion of the Corporation and their counsel.

13.      **Applicability to Representatives and Affiliates**. The obligations of Receiving Party hereunder of nondisclosure and nonuse shall extend to its affiliates and Representatives.

14.      **Representative Defined**. For purposes of this Agreement, "Representative" shall mean Receiving Party's employees, affiliates, and advisors.

See, *June 21, 2017 Wondfo NDA*, attached as **_Exhibit 4_**.

## G. The June 27, 2017 MFB/Wondfo Product Testing and Evaluation Agreement

31.      On June 27, 2017, MFB and Wondfo entered into Product Testing and Evaluation Agreement pursuant to which MFB would send to Wondfo five hundred (500) pregnanediol (PdG) urine test strips ("PdG Products").

13

32. The Product Testing and Evaluation Agreement, among other things, restricted Wondfo' s use of the PdG Products to the purpose set forth therein and further acknowledged (again) that the PdG Products and the testing results constitute confidential and proprietary information belong to MFB:

**2. Product Use Rights**

Company [Easy Healthcare] may use the Products solely for the purpose of internally testing the Products. The Products may not be resold or provided to any third party. MFB retains ownership of all right, title and interest in all intellectual property, including any trade secrets, relating to the Products.

**3. Restrictions**

**Company shall not (and shall not allow any third party to**): (i) modify or create derivative works of the Products; (ii) **reverse engineer the Products**; and (iii) use the products, or any of MFB's intellectual property rights in the Products, for any purpose other than MFB's evaluation and testing of the Products. (Emphasis added)

**5. Feedback**

Company agrees to provide to MFB reasonable suggestions, comments and feedback regarding the Products based on MFB's evaluation and testing of the Products ("Feedback").

**6. Confidentiality**

**The Products and Feedback constitute confidential and proprietary information belonging to MFB** (collectively, "Proprietary Information"). Except to the extent authorized in this Agreement or by MFB in writing, Company agrees: (a) not to make any other use of the Proprietary Information; (b) not to duplicate the Proprietary Information; (c) not to make the Proprietary Information available to any third party in any form; and (d) to safeguard the Proprietary Information to the same extent that Company protects its own confidential or proprietary information of similar importance. (Emphasis added)

See, *June 2017 Product Testing and Evaluation Agreement*, attached as **_Exhibit 5_**.

### H. MFB Shares Confidential, Proprietary and Trade Secret Information with Easy Healthcare and Wondfo

33. In reliance on the confidentiality provisions in their agreements and the Non-Compete, MFB disclosed confidential, proprietary and trade secret information ("Confidential

Information") to Defendant, Easy Healthcare and non-party Wondfo. Plaintiff cannot reveal in this public filing the substantive details of all of its Confidential Information; however, it can reveal, in general terms, examples of the type of its confidential, proprietary and trade secret information shared with Easy Healthcare and Wondfo:

- Confidential information associated with the construction of the strip to advance the development of an app configured to read Proov products.
- Activity and performance characteristics of the reagents used in MFB's PdG test system.
- Information exchanged in face-to-face meetings with Wondfo about the reagents used by MFB and its use, cost, and amount per test strip.
- The 200 sample tests sent free-of-charge so long as Wondfo did not use them to reverse engineer the tests.
- Email conversations about the difference between LH and PdG and explaining how LH does not always confirm ovulation.
- Information relayed to Wondfo and Easy Healthcare on clinical validation studies, and an explanation of those studies and results, including the need for first morning urine, the different metabolism profiles of Asian vs. European women, cross reactivity of the test system, and PdG test values in post-ovulation and pregnant women.
- The clinical significance of a negative PdG test in infertility and risk of miscarriage.
- Necessary differences required for tests sold in Asian countries to address different concentrations of hormone metabolites in different populations, as shared by email on September 4, 2017.
- The protocol necessary for best results in testing methodology, as shared by email on September 4, 2017.
- The dry powder dilution formula for the test calibration

## I. The Parties' Discussions After the Termination of the Distribution Agreement

34. During the period of 2018-20 and following the termination of the Distribution Agreement on January 15, 2018, Ms. Liu (with Easy Healthcare) persisted in engaging Dr. Beckley (with MFB) in discussions related to the possibility of MFB continuing to supply PdG tests to Easy Healthcare for sale. Ms. Liu continued to represent that she could assist MFB with lower cost

manufacturing resources (through Wondfo) and repeatedly expressed her desire to manufacture and distribute the MFB PdG tests.

35.     By the Fall of 2019, however, Dr. Beckley had become increasingly uncomfortable with the risk of the loss of confidential information, the availability of quality control and the logistical challenges associated with manufacturing PdG tests at the facilities suggested by Ms. Liu in China. By mid-November 2019, discussions about continuing to work together ended.

36.     At no point in time after the termination of the Distribution Agreement in January 2018 did MFB ever advise Easy Healthcare or Ms. Liu or Wondfo that they were not still bound by the confidentiality and non-competition provisions set forth in the agreements they signed.

**J.    Easy Healthcare's <u>Multiple</u> Violations of the Non-Compete**

37.     It became abundantly clear to MFB, from its pre-filing investigation, that Easy Healthcare has been, and continues to, methodically violate its Non-Compete by engaging in a variety of wrongful actions intended to put a Competing Product before both identifiable potential customers and the general public. These efforts have included, but are not limited to: maintaining competing and <u>blatantly misleading</u> Amazon listings for a Competing Products as a placeholder to maintain interest and drive traffic to its website and business; directly communicating (again misleadingly) with potential customers as to the availability of a Competing Product; sending out to customers unsolicited PdG "test" products "to sample" that currently compete with MFB; and manufacturing a competing product – <u>all</u> during the pendency of the MFB Non-Compete.

**a)    Easy Healthcare's Wrongful Maintenance of its Competing Amazon Listing**

38.     Despite the expiration of the Distribution Agreement, and the survival of the Non-Compete and confidentiality terms, Easy Healthcare continued to maintain listings on Amazon of a Competing Product (as defined in the Distribution Agreement).

39.     Easy Healthcare purposely maintained these Amazon listings so as to misrepresent that it had PdG products to sell when, in fact, the parties were <u>not</u> in contract and MFB had ceased supplying Easy Healthcare with any PdG products to sell.  The Amazon listings are excerpted below:





**\*\*\***



40. In its Amazon listings, Easy Healthcare misleadingly states that the Competing

Product had **not** been discontinued by the manufacturer (Easy Healthcare) – it had been - and that

the "*Date First Available*" (meaning when first sold pursuant to the listing) was **January 22, 2019** which, by no coincidence, was <u>one week</u> after the termination of Distribution Agreement <u>and one week into the Non-Compete</u>.

41.     It also become increasingly apparent why Easy Healthcare had maintained its Amazon listings in a manner confusingly similar to the MFB listings - despite not having a PdG test to sell during the Non-Compete period.  Easy Healthcare's Amazon listings, for example, incorporate the phrase "*Allows you to 'double check' ovulation has occurred without the need for daily temperature charting*" despite MFB's ownership of the Federal Registration of the "Ovulation Double Check" trademark ("Ovulation Double Check" Federal Trademark Registration 5,106,845).  The maintenance of the Amazon listings with key search terms (such as "Ovulation Double Check") and other attributes misdirected consumer traffic away from listings owned by MFB despite Easy Healthcare's contractual obligations to not compete for a period of three (3) years.

42.     Moreover, and as of November 12, 2020, Easy Healthcare still maintained a purchase page on its website, set forth below:

From: https://healthcare-manager.com/pages/progesterone-pdg-tests



43.    Notwithstanding the termination of the Distribution Agreement, and contractual obligation to not engage with a competitive manufacturer, Easy Healthcare also continued to maintain and engage in paid advertising for listings related to a PdG tests on Amazon.com, Walmart.com, Easy@Home website, and elsewhere. Easy maintained and updated these listing at least as late as November 2020, which ensured competitive search ranking on Google and Amazon with MFB listings, despite not having a product to sell.

44.    The purposeful presence of Easy Healthcare's listings for PdG products on Amazon and elsewhere not only violates the Non-Compete but misleads current and potential customers of MFB as to the potential availability of a Competing Product from Easy Healthcare and has damaged MFB's efforts to achieve search engine optimization, a favorable Amazon ranking and maintain the distinctiveness of its products.

b) **Easy Healthcare's Amazon Listings Misrepresent That It Can Sell a PdG Test That is "FDA Approved"**

45.     To date, MFB has the only FDA Cleared product in the QKE category for FDA registered progesterone test systems ("FDA-Approved QKE Product Category"). No other company has received FDA Clearance within the FDA-Approved QKE Product Category pertaining to over the counter pregnanediol glucuronide immunoassays, which is the fundamental technology invented by Dr. Beckley that underlies Proov.

46.     Following MFB's achievement of receiving its own FDA clearance for PdG tests in March 2020, Easy Healthcare changed its Amazon listings to market Easy Healthcare branded tests as "FDA Cleared" – a false statement which persisted in association with Easy Healthcare's listings from at least April 2020-November 2020.

47.     Easy Healthcare's competitive listings and paid advertising, associating the term "FDA Cleared" with listings owned by Easy Healthcare when, in fact only MFB is "FDA Cleared," not only violates the Non-Compete but has resulted in confusion in the marketplace and raised the cost of MFB's advertising and online marketing activities associated with MFB's PdG tests.

48.     The misrepresentation of FDA approval constitutes not only a misrepresentation to general public but is part of Easy Healthcare's strategic and coordinated effort to circumvent the Non-Compete by continuing to illegally trade on a prior relationship it had with MFB.

c) **Easy Healthcare's Wrongful Manufacture of PdG Products and Direct Solicitation of Customers to Test a Competing Product**

49.     In further violation of the Non-Compete, Easy Healthcare's product development efforts of PdG Products led to the actual testing in 2020 of Easy Healthcare branded PdG tests.

50.     In November 2020, Easy Healthcare sent out unsolicited e-mails to potential consumers of PdG Products which, under the Non-Compete, it was prohibited from directly or indirectly manufacturing to and/or selling. As one consumer stated in an email to MFB: "I *was*

reached out to [b]y easy at home to try their PD[G] strips, so I also have one of those for comparison." The consumer sent to Dr. Beckley (MFB) photographs of the test that Easy Healthcare had sent to her and Easy Healthcare's Instructions for use which essentially mirror those provided by MFB to Easy Healthcare – and violate MFB's copyright - when the Distribution Agreement was in effect.

51.    Moreover, Easy Healthcare directly communicated with potential PdG customers misrepresenting to them its status as a <u>current manufacturer</u> of PdG products and suggesting, when asked, that its PdG products were merely out of stock. For example, and on November 9, 2020 and in response to an online inquiry as to the availability of PdG products via Easy Healthcare's website **www.premom.com**, Easy Healthcare stated: "*We are going to start selling them, I am not yet sure if they are available…*" and "*I believe they might have come in this week. **You can check next week** for listing*." (emphasis added). A screen shot of the we website chat is set forth below:



**K. Easy Healthcare's Misappropriation of MFB's Confidential Information to Configure Its Easy@Home App**

52.     At some point following Dr. Beckley's disclosure of MFB's confidential information to Ms. Liu, Easy Healthcare released a digital solution in the form of an app operating on a mobile device, configured to evaluate PdG tests (the "Easy App").

53.     Dr. Beckley, relying on the confidentiality provisions in the agreements signed by the parties, assisted Easy Healthcare with configuring its Easy App so that it could accurately read PdG tests supplied by MFB (pursuant to the Distribution Agreement), along with the LH tests (a different technology) sold by Easy Healthcare. Easy Healthcare incorporated the confidential and proprietary information provided by MFB into the Easy App.

54.     Easy Healthcare's continued use of confidential and proprietary information provided by Dr. Beckley to configure the Easy App violates the confidentiality provisions of the Distribution Agreement.

55.     Easy Healthcare's continued use of the Easy App that incorporates a functionality to accurately read PdG tests is part of Easy Healthcare's strategic and coordinated effort to circumvent the Non-Compete by continuing to offer an application that advertises itself as one that can accurately read PdG tests – tests it cannot sell - during the period of a Non-Compete that prohibited Easy Healthcare from manufacturing or selling a Competing Product.

**L. The Easy App Has Been Subject to a Significant Data Breach Resulting in Attorney General Investigations and a Diminishment of MFB's Brand**

56.     In August of 2020, the International Digital Accountability Council (IDAC), a non-profit privacy group, determined that the fertility app *Premom* (owned by Easy Healthcare and referred to herein as the "Easy App") had been sharing data with three Chinese firms without obtaining user consent. The Washington Post subsequently has reported that the IDAC had brought the matter to the Federal Trade Commission (FTC) on August 6, 2020, as well the Attorney

General of Illinois, maintaining that Premom violated probable state and federal laws due to the data-sharing incident.

57.     On August 31, 2020, Sherry Liu, CEO of Easy Healthcare was advised by the Attorney General for the State of Connecticut of the data breach involving the Easy App (referred to by the AG's Office as the "Premom app"):

> Our offices have become aware of reports that your company's fertility mobile application ("app")— Premom— has shared sensitive user data with third party advertising and analytics firms without disclosing that fact to your users and obtaining their consent. According to the reports, the information shared by Premom includes location data and persistent device identifiers, as well as inventories of all applications installed on users' phones. Further, the reports indicate that Premom engaged in ID bridging, allowing third parties to assemble comprehensive advertising profiles of users through tracking actions across apps and physical locations.

See, *State of Connecticut AG Notice*, *August 31, 2020,* attached as ***Exhibit 6.***

58.     Easy Healthcare's continued use of the Easy App, which incorporates the MFB confidential technology capable of reading its Proov products, while at the same time putting personal health information of its customers at risk, has caused and continues to harm the MFB brand, whose customers often utilize the Easy App without knowing that it is not sanctioned by MFB.

**M. Easy Healthcare's Refusal to Return MFB's Property**

59.     Pursuant to the Distribution Agreement, Easy Healthcare agreed to return all of MFB's property in its "possession, custody or control" including, but not limited to, copies of all Confidential Information (as that term is defined) within thirty (30) days of the effective date of termination:

> **Section 12.4 (Effect of Termination)**.
>
> **(e) Return of Materials**. Within thirty (30) days of the effective date of termination, each party shall return or dispose of all of the other party's property then in its possession, custody or control according to the other party's directions

24

and at the other party's expense and shall return or destroy all copies of Confidential Information. (Emphasis added)

60.     The Agreement formally terminated on January 15, 2018.   As such, Easy Healthcare was required to return all of MFB's Property on or before February 15, 2018. Not only did Easy Healthcare not return the MFB Property as required but wrongfully utilized MFB's confidential, proprietary and trade secret information for the purpose of manufacturing a Competing Product for sale.

61.     On November 20, 2020, and on <u>multiple</u> occasions thereafter before the filing this action, MFB demanded of Easy Healthcare's counsel the return of all MFB Property (whether or not deemed by Easy Healthcare to be confidential or proprietary) as required pursuant to Section 12.4 of the Distribution Agreement. Easy Healthcare has refused to comply – in breach of the Distribution Agreement.

### N.  Easy Healthcare Continues to Violate MFB's Registered Copyrights

62.     MFB owns the copyright for its Instructions for Use (Registration Number TX 8-912-831) of the Proov product it allowed Easy Healthcare to sell when the parties were in contract.

63.     In its efforts to further confuse the market and to leave potential customers with the belief that Easy Healthcare is still authorized to sell progesterone test strips, Easy Healthcare copied MFB's original instructions for use ("Instructions for Use"), including nearly identical graphics.   See, *MFB Instructions for Use for Ovulation Double Check Test* and *Easy@Home Progesterone Test Strip Instructions for Use*, attached as ***Group Exhibit 7***.

64.     One consequence, for example, of copying MFB's Instructions for Use, is that the Easy@Home Test Strip Instructions falsely and misleadingly state that: "*in our research studies, most home users reported positive results 5-10 days after suspected ovulation.  Clinically, positive*

*results were observed when serum progesterone levels were >10ng/ml*." As this text was copied from the MFB's Instructions, Easy Healthcare Instructions represent that it did testing it never did.

65.     Easy Healthcare continues to hold out MFB's marketing materials as its own and is infringing on the copyrights belonging to MFB.

## COUNT I
## (INJUNCTION)

66.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 – 65 above as the allegations of this paragraph 66.

67.     All conditions precedent necessary, if any, for the enforcement of the Distribution Agreement have been satisfied.

68.     The Non-Compete covenants are reasonably necessary to protect MFB's legitimate business interests, including its interests in the Confidential Information to which the Defendant was given access solely pursuant to the terms of their agreements, including the Distribution Agreement.

69.     Defendant has breached the Distribution Agreement by violating the Non-Compete provisions in the Distribution Agreement.

70.     MFB has been injured irreparably as a direct and proximate result of the breach of the Distribution Agreement.

71.     MFB has no adequate remedy at law and is suffering irreparable harm because the Defendant's conduct is eroding its competitive position, a loss which is incapable of being measured in monetary damages.

72.     The balance of the equities favors the requested injunctive relief.

73.     The requested injunctive relief is in the public interest.

WHEREFORE, Plaintiff, MFB Fertility Inc., requests that this Court enter judgment against the Defendant and award the following relief:

a) Preliminary and permanent injunctions restraining and enjoining the Defendant from continuing to breach the Distribution Agreement, specifically enforcing the non-compete covenant of the Distribution Agreement);

b) Preliminary and permanent injunctions restraining and enjoining the Defendant from continuing to breach their Distribution Agreements;

c) Preliminary and permanent injunctions restraining and enjoining the Defendant from operating the Easy@Home App;

d) Requiring the Defendant to return any of Plaintiff's Property pursuant to the terms of the Distribution Agreement and any Confidential Information in its possession, control or custody;

e) Requiring the Defendant, solely at its cost, to immediately provide access to and permit a forensic copy be made by Plaintiff's chosen ESI vendor of all of their computers (including, but not limited to, iPads), Personal Digital Assistants, mobile emails or smartphone devices (including, but not limited to, Blackberries, cellular phones, text messaging devices, iPhones, Androids, etc.) and storage media (including, but not limited to, flash drives, USB drives, external hard drives, DVDs, CDs, etc.);

f) Requiring the Defendant to confidentially provide MFB's chosen ESI vendor with the user names and passwords of any personal email accounts used by the Defendant and permit access to and a forensic copy to be made of the contents of any such email accounts to verify the return, removal and destruction of all MFB's Confidential Information;

g) Reasonable attorneys' fees and costs against the Defendant, as allowed under the Distribution Agreements; and

h) Such other and further relief as this Court may deem proper.

<u>**COUNT II**</u>
**(VIOLATION OF THE DEFEND TRADE SECRETS ACT 18 U.S.C. § 1836)**

74.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 – 65 above as the allegations of this paragraph 74.

75.     MFB's confidential and proprietary information and trade secrets, in part referenced above ("Confidential Information") and identified herein constitute trade secrets within the meaning of the Defend Trade Secrets Act 18 U.S.C. § 1836 ("DTSA") because its secrecy gives MFB an economic advantage over its competitors, it was imparted to Defendant for the sole purpose of facilitating their contractual work together, is not generally available to the public, was kept secure and strictly confidential, and it would not have been known to Defendant but for their work together.

76.     MFB is the owner of valid and enforceable trade secrets within the meaning of the Defend Trade Secrets Act 19 U.S.C. § 1836 ("DTSA") including, but not limited, to the proprietary technology and information set forth in paragraph 34.

77.     Defendant had regular access to MFB's confidential and proprietary information and trade secrets.

78.     All of MFB's trade secrets are confidential, proprietary, and highly valuable secrets; and not generally known or readily ascertainable and are solely owned by MFB. MFB has taken reasonable precautions to maintain the secrecy of its trade secrets including maintaining confidentiality provisions in Distribution Agreement with key employees, secured password-protected networks and databases, and insisting on robust confidentiality agreements with third parties to whom the information is disclosed.

79.     MFB's Confidential Information represents a vital resource to MFB, and, therefore, has independent economic value because it is not known to the general public or even to people engaged in the same business as MFB.

80.     MFB's Confidential Information is the lifeblood of its business. MFB spends significant financial resources each year in order to compile, create and formulate its Confidential Information.

81.     MFB has a legitimate business interest in its Confidential Information. Access to MFB's Confidential Information would give an MFB competitor an unfair advantage over MFB because any competitor with access to this information could use it to conduct trading and to interfere in relationships between MFB and its counter-parties without having made the investment of time, labor, and capital that MFB has made to create, compile and formulate MFB's Confidential Information.

82.     Furthermore, access to MFB's Confidential Information would provide MFB's competitors with an unfair advantage over MFB because it would provide a roadmap to compete with MFB.

83.     Because of the importance of MFB's Confidential Information, such information has been, and is, the subject of reasonable efforts by MFB to maintain its confidentiality. These efforts include, but are not limited to, limiting access to its Confidential Information to only certain employees on a need-to-know basis and the use of confidentiality and non-compete covenants (as set forth in the Distribution Agreement) so as to protect its legitimate business interests.

84.     MFB requires that personnel with regular access to Confidential Information, including Defendants, sign restrictive covenants and non-disclosure agreements as a condition of employment.

85.     Defendant agreed to keep MFB's trade secrets confidential and further agreed that those trade secrets were owned by MFB.

86.     Defendant never received MFB's permission to disclose any of its Confidential Information, including its trade secrets, to any third party, or to utilize MFB's Confidential Information, including its trade secrets, for its own benefit.

87.     Defendant's use of MFB's Confidential Information, including its trade secrets, will give it the ability to leverage, and commercially exploit, MFB's Confidential Information, including its trade secrets, without permission or authorization.

88.     Defendant knows that MFB's trade secrets were confidential, proprietary, and highly valuable, and was obtaining access to MFB's trade secrets through its relationship with the Defendant.

89.     MFB's confidential, proprietary, and trade secret information was acquired by Defendant through willful, malicious and improper means for its benefit and for those acting in concert with it.

90.     Defendant's actions constitute a willful and malicious violation of the DTSA.

91.     Defendant inevitably will profit and gain an economic advantage from its prior and continued use, disclosure, reliance upon and misappropriation of MFB's confidential, proprietary, and trade secret information.

92.     The public policy in favor of the protection of MFB's interest in maintaining its confidential, proprietary, and trade secret information greatly outweighs any possible interest

Defendant may claim in maintaining use and access to MFB's confidential and proprietary information and trade secrets.

93. As a result of the above, MFB has no adequate remedy at law and has suffered and will continue to suffer an imminent risk of further irreparable harm. Therefore, MFB requests that Defendant's activities be enjoined by the Court; that Defendant be required to cease any and all disclosure or use of MFB's confidential and proprietary information and trade secrets; and that Defendant be required to identify and return all of MFB's confidential, proprietary, and trade secret information it misappropriated.

94. As a direct and proximate result of Defendant's misappropriation of confidential, proprietary, and trade secret information, MFB has suffered and continues to suffer immediate and irreparable injury, loss, harm or damage, and will continue to suffer said injury, loss, harm, or damage, unless and until Defendant is enjoined and restrained.

95. The foregoing acts constitute misappropriation or threatened misappropriation of MFB's trade secrets under the Defend Trade Secret Act, 28 U.S.C. § 1836.

96. The conduct of Defendant is malicious, deliberate, and willful, or in the alternative at least grossly negligent.

97. Defendant's misappropriation or threatened misappropriation of MFB's trade secrets has caused and/or will cause damage to MFB in an amount to be proven at trial.

WHEREFORE, Plaintiff, MFB Fertility Inc., requests that this Court enter judgment against the Defendant and award the following relief:

a)   Preliminary and permanent injunctions restraining and enjoining the Defendant from continuing to breach their Distribution Agreements, specifically enforcing the non-solicitation and non-competition covenant of their Distribution Agreements) for the term of eighteen (18) months from the date of the entry of judgment herein;

b)   Preliminary and permanent injunctions restraining and enjoining the Defendant from continuing to breach their Distribution Agreement;

c)   Preliminary and permanent injunctions restraining and enjoining the Defendant from operating the Easy@Home App;

d)   Requiring the Defendant to return any of MFB's Confidential Information in their possession, control or custody;

e)   Requiring the Defendant, solely at its cost, to immediately provide access to and permit a forensic copy be made by Plaintiff's chosen ESI vendor of all of their computers (including, but not limited to, iPads), Personal Digital Assistants, mobile emails or smartphone devices (including, but not limited to, Blackberries, cellular phones, text messaging devices, iPhones, Androids, etc.) and storage media (including, but not limited to, flash drives, USB drives, external hard drives, DVDs, CDs, etc.);

f)   Requiring the Defendant to confidentially provide Plaintiff's chosen ESI vendor with the user names and passwords of any personal email accounts used by the Defendant and permit access to and a forensic copy to be made of the contents of any such email accounts to verify the return, removal and destruction of all MFB's Confidential Information;

g)   Reasonable attorneys' fees and costs against the Defendant, as allowed under the Distribution Agreements; and

h)   Such other and further relief as this Court may deem proper.

<u>COUNT III</u>
**(BREACH OF CONTRACT – DISTRIBUTION AGREEMENT)**

98.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 – 65 above as the allegations of this paragraph 98.

99.     The Non-Compete covenant is reasonably necessary to protect MFB's legitimate business interests, including its interests in the Confidential Information.

100.     Defendant has breached the Distribution Agreement by failing to return MFB's Confidential Information including its trade secrets, and instead utilizing the foregoing in its attempts to compete with MFB.

101.     On information and belief, Defendant has further breached the Distribution Agreement by using or disclosing MFB's Confidential Information.

102.     MFB has complied with and performed all obligations required of it under the Distribution Agreement.

103.     Defendant's wrongful actions will or have proximately caused damage to MFB's legitimate business interests, competitive position, goodwill, and reputation and deny MFB the benefit of its bargain with respect to the Distribution Agreement.

104.     MFB has been injured irreparably as a direct and proximate result of the breaches of contract by Defendant and has suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiff, MFB Fertility Inc., requests that this Court enter judgment against the Defendants and award the following relief: actual damages to be proven at trial; reasonable attorneys' fees and costs against the Defendant as allowed under the Distribution Agreements; and such other and further relief as this Court may deem proper.

## COUNT III
### (BREACH OF CONTRACT – PRODUCT TESTING AGREEMENT)

105.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 – 65 above as the allegations of this paragraph 105.

106.    On February 22, 2017, MFB and Easy Healthcare entered into a Product Testing and Evaluation Agreement  ("Product Testing Agreement") pursuant to which MFB would send fifty (50) pregnanediol (PdG) urine test strips ("PdG Products") to Easy Healthcare solely for the purpose of internally testing the PdG Products prior to entering into a formal distribution agreement.

107.    The Product Testing Agreement, among other things, restricted Easy Healthcare's use of the PdG Products to the purpose set forth therein and acknowledged that the PdG Products and the testing results constitute confidential and proprietary information belonging to MFB:

**2. Product Use Rights**

Company [Easy Healthcare] may use the Products solely for the purpose of internally testing the Products. The Products may not be resold or provided to any third party. MFB retains ownership of all right, title and interest in all intellectual property, including any trade secrets, relating to the Products.

**3. Restrictions**

**Company shall not (and shall not allow any third party to**): (i) modify or create derivative works of the Products; (ii) **reverse engineer the Products**; and (iii) use the products, or any of MFB's intellectual property rights in the Products, for any purpose other than MFB's evaluation and testing of the Products. (Emphasis added)

**5. Feedback**

Company agrees to provide to MFB reasonable suggestions, comments and feedback regarding the Products based on MFB's evaluation and testing of the Products ("Feedback").

**6. Confidentiality**

**The Products and Feedback constitute confidential and proprietary information belonging to MFB** (collectively, "Proprietary Information"). Except to the extent authorized in this Agreement or by MFB in writing, Company agrees: (a) not to make any other use of the Proprietary Information; (b) not to duplicate the Proprietary Information; (c) not to make the Proprietary Information available to any third party in any form; and (d) to safeguard the Proprietary Information to the same extent that Company protects its own confidential or proprietary information of similar importance. (Emphasis added)

See, *Product Testing Agreement*, previously attached as ***Exhibit 2.***

108.     As such, and from their very first work together, Easy Healthcare acknowledged that MFB's PdG Products urine test strips, as well as the results of any evaluation and testing of the Products and the Feedback (information <u>critical</u> to the PdG Products' success and viability), constitute confidential and proprietary information belonging to the Plaintiff, MFB.

109.     Defendant has further breached the Product Testing Agreement by using or disclosing MFB's Proprietary Information.

110.     MFB has complied with and performed all obligations required of it under the Product Testing Agreement.

111.     Defendant's wrongful actions have proximately caused damage to MFB's, monetary and otherwise.

112.     MFB has been injured as a direct and proximate result of the breach of contract by Defendant and has suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiff, MFB Fertility Inc., requests that this Court enter judgment against the Defendants and award the following relief: actual damages to be proven at trial; and such other and further relief as this Court may deem proper.

<u>COUNT IV</u>
**(COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 101 ET SEQ.)**

113.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 – 65 above as the allegations of this paragraph 113.

114.     Plaintiff's Instructions for Use are an original work of authorship in the form of text, photographs, and artwork fixed in a tangible medium and are thereby copyrightable.

115.     Plaintiff owns the copyright for its Instructions for Use, known Ovulation Double Check, registration number TX 8-912-832.

116.     Easy's use of the Infringing Instructions for Use and other conduct set forth herein has been and/or continues to be an infringement of Plaintiff's Copyright in violation of Section 106 and 501 of the Copyright Act.

117.     Easy's infringement was willful, intentional and purposeful, in disregard of and with indifference to Plaintiff's rights.

118.     As a direct and proximate result of Easy's infringement, Plaintiff is entitled to damages in an amount to be proven at trial.

119.     Plaintiff is also entitled to Easy's profits attributable to the infringement, pursuant to 17 U.S.C. § 504(b), including an accounting of and a constructive trust with respect to such profits.

120.     Plaintiff is also entitled to its attorneys' fees and costs pursuant to 17 U.S.C. § 505.

121.     As a direct and proximate result of the foregoing conduct, Plaintiff has sustained and will continue to sustain substantial, immediate and irreparable injury for which there is no adequate remedy at law.

WHEREFORE, Plaintiff, MFB Fertility Inc., requests that this Court enter judgment against the Defendant and award the following relief:

a)     Declaring that Defendant has violated the Copyright Act of 1976, 17 U.S.C. § 101, et seq.;

b)     Permanently enjoining Defendant, its subsidiaries, parents, divisions, directors, officers, owners, partners, agents, employees, attorneys, representatives, and all those persons in active concert and participation with it, either directly or indirectly, from violating Plaintiff's rights by way of continuing to infringe upon its copyright;

c)     For damages in such amount as may be found, or as otherwise permitted by law;

d)     For an accounting of, and the imposition of constructive trust with respect to, Defendant's profits attributable to its infringement of Plaintiff's copyright;

e)     Granting Plaintiff's attorneys' fees and costs in this action;

f)     Granting all other injunctive and monetary relief as this Court deems just and proper.

Dated: December 31, 2020                    MFB Fertility Inc., a Colorado Corporation


                                            By:     /s/ Gary I/ Blackman
                                                    One of Its Attorneys

Gary I. Blackman (ARDC # 6187914)
Christina E. Carrière Lutz (ARDC # 6297074)
Erin M. Mayer (ARDC # 6313447)
LEVENFELD PEARLSTEIN, LLC
2 North LaSalle Street – Suite 1300
Chicago, Illinois 60602
(312) 346-8380
(312) 346-8434 (Fax)
gblackman@lplegal.com
celutz@lplegal.com
emayer@lplegal.com